IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| Shingobee Builders, Inc, ) | |
| ) | |
| Plaintiff, ) | **ORDER GRANTING DEFENDANT'S** |
| ) | **MOTION TO DISMISS** |
| vs. ) | |
| ) | Case No. 1:18-cv-57 |
| North Segment Alliance, ) | |
| ) | |
| Defendant. ) | |

Before the Court is the Defendant's motion to dismiss the complaint filed on April 16, 2018. See Docket No. 8. The Plaintiff filed a response on May 7, 2018. See Docket No. 12. On May 21, 2018, the Defendant filed a reply brief. See Docket No. 14. For the reasons set forth below, the Defendant's motion to dismiss the complaint is granted.

I.  **BACKGROUND**

Premised on the parties' diversity of citizenship, Shingobee Builders, Inc. (Shingobee) brings a breach-of-contract suit against North Segment Allliance (NSA). See Docket No. 1, pp. 1, 4-7. NSA is a non-profit corporation chartered under tribal law by the Mandan, Hidatsa, and Arikara Nation (MHA Nation), a federally recognized Indian tribe. See Docket No. 10-2, p. 2. Shingobee's contract claims stem from its work on the construction of an apartment complex in New Town, North Dakota, located within the boundaries of the Fort Indian Berthold Reservation. See Docket No. 1, p. 2.

On July 31, 2015, Shingobee signed a Guaranteed Maximum Price contract with NSA's predecessor in interest[1] to construct a "30 unit apartment building and . . . student housing" known

---

[1] NSA's predecessor in interest, the North Segment Development Corporation, was also chartered by the MHA Nation. See Docket No. 10-6, p. 2.

1

as the Red Hawk Estates Project. See Docket No. 1, p. 2; Docket No. 9, p. 9; Docket No. 10-3, p. 2 (capitalization altered). Under the contract, NSA's predecessor agreed to pay Shingobee for work as the construction manager and general manager of that project. See Docket No. 1, p. 2; Docket No. 10-3, p. 2.

On March 8, 2017, the Tribal Business Council, the governing body of the MHA Nation, authorized the formation of NSA as a tribal non-profit corporation "under the laws of the Tribe," and articles of incorporation were filed that same day. See Docket No. 10-1, p. 2; Docket No. 10-2, p. 2; Docket 10-6, p. 2. On March 9, 2017, the MHA Nation dissolved NSA's predecessor and authorized NSA to "assume[] all assets and liabilities of [the predecessor]." See Docket No. 10-6, p. 3. Shingobee describes that, thereafter, the parties twice amended the contract, each time enlarging the scope of work. See Docket No. 1, pp. 1-3. Shingobee asserts that it has not received payment for work it performed pursuant to the contract amendments. See Docket No. 1, p. 3.

As the party invoking federal jurisdiction, Shingobee asserts in its complaint that the Court has subject matter jurisdiction because "the action involves citizens of different states and the amount in controversy exceeds $75,000." See Docket. No. 1, p. 2. Specifically, Shingobee asserts that it "is a Minnesota corporation" with a principal place of business in Minnesota and that NSA should be "deemed a citizen of North Dakota" because it is a "tribal corporation organized to conduct business on behalf of the Three Affiliated Tribes of the Fort Berthold Reservation [in] North Dakota." See Docket No. 1, p. 1. Shingobee's complaint makes no reference to any federal law giving rise to any of its claims.

NSA moves under Rule 12(b)(1) to dismiss this diversity action in its entirety.[2] See Docket No. 8. NSA asserts that the Court lacks jurisdiction because NSA, as a tribal entity, (1) is not a

---

[2] NSA also moves to dismiss the complaint under Rule 12(b)(6) because Shingobee "has failed to allege and cannot allege this Court's jurisdiction over the controversy or NSA's . . . waiver of

citizen of any state and not subject to diversity jurisdiction and (2) functions as an arm of the Tribe and is protected by sovereign immunity.[3] See Docket No. 9, pp. 12, 15.

A tribe's immunity from suit and lack of state citizenship are related but independent bars to subject matter jurisdiction. See Hagen v. Sisseton-Wahpeton Cmty. Coll., 205 F.3d 1040, 1043 (8th Cir. 2000) (explaining that tribal sovereign immunity is jurisdictional). There appears, however, to be no mandatory sequence in which to address those issues.[4] See, e.g., Sinochem Int'l Co. v. Malay. Int'l Shipping Corp., 549 U.S. 422, 430-31 (2007); Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 584 (1999). But see Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth., 207 F.3d 21, 28 (1st Cir. 2000) (holding that subject matter jurisdiction must be addressed prior to tribal sovereign immunity).

Because the Court lacks subject matter jurisdiction, as detailed below, the Court need not consider whether NSA is immune from or has consented to suit. See Auto-Owners Ins. Co. v. Tribal Court of Spirit Lake Indian Reservation, 495 F.3d 1017, 1020 (8th Cir. 2007) ("Even if an Indian tribe waives its sovereign immunity, such a waiver does not automatically confer jurisdiction on federal courts."); Weeks Const., Inc. v. Oglala Sioux Hous. Auth., 797 F.2d 668,

---

sovereign immunity." See Docket No. 9, p. 7. It is not necessary to resolve those arguments because they mirror NSA's 12(b)(1) arguments and their analysis would be duplicative. As explained below, NSA's facial attack on jurisdiction under Rule 12(b)(1) functions like a 12(b)(6) motion. The Court considers undisputed facts in the record, which are the same facts the Court would consider under a 12(b)(6) motion, and Shingobee receives the same protections as it would as the non-moving party in a 12(b)(6) motion.

[3] NSA does not have to succeed on both arguments. Even where the requirements of diversity jurisdiction are satisfied, a tribal entity's sovereign immunity may still preclude jurisdiction. Even where a tribal entity has waived sovereign immunity, the requirements of diversity jurisdiction may still not be satisfied. See, e.g., Charland v. Little Six, Inc., 112 F. Supp. 2d 858, 864 (D. Minn. 2000) (explaining that "there would not be diversity jurisdiction" over a tribal casino even if it "were not immune from suit."), aff'd on other grounds sub nom. Charland v. Little Six, 13 F. App'x 451 (8th Cir. 2001)

[4] A federal court may not, however, reach the merits of a case without first determining it has subject matter jurisdiction. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 93-102, 118 (1998).

671 (8th Cir. 1986) ("Mere consent to be sued, even consent to be sued in a particular court, does not alone confer jurisdiction upon that court to hear a case if that court would not otherwise have jurisdiction over the suit.").

## II. LEGAL DISCUSSION

As courts of limited jurisdiction, federal courts possess only the powers authorized by the Constitution and statute, referred to as subject matter jurisdiction. Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994). "[I]t is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction.'" Dakota, Minn. & E.R.R. Corp. v. Schieffer, 715 F.3d 712, 712 (8th Cir. 2013) (internal quotation marks omitted) (quoting Kokkonen, 511 U.S. at 377). The party invoking federal jurisdiction must establish subject matter jurisdiction by a preponderance of the evidence. Moss v. United States, 895 F.3d 1091, 1097 (8th Cir. 2018).

### A. STANDARD OF REVIEW

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a party to challenge a federal court's subject matter jurisdiction at any time in the proceedings. When moving to dismiss under Rule 12(b)(1), a party "may assert either a 'facial' or 'factual' attack on jurisdiction." Moss, 895 F.3d at 1097. A court must determine whether a 12(b)(1) motion is a facial attack or a factual attack on jurisdiction. Carlsen v. GameStop, Inc., 833 F.3d 903, 908 (8th Cir. 2016) (quoting Osborn v. United States, 918 F.2d 724, 729 n.6 (8th Cir. 1990)). A facial attack on jurisdiction "is based on the complaint alone or on undisputed facts in the record." Harris v. P.A.M. Transp., Inc., 339 F.3d 635, 637 (8th Cir. 2003).

> In a facial attack, the court restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6).[5] In a factual attack, the court considers matters outside the pleadings, and the non-moving party does not have the benefit of 12(b)(6) safeguards.

Carlsen, 833 F.3d at 908 (footnote added) (citation and internal quotation marks omitted) (quoting Osborn, 918 F.2d at 729 n.6). Considering "matters outside the pleadings when subject matter jurisdiction is challenged under Rule 12(b)(1)" does not "convert the 12(b)(1) motion to one for summary judgment." Harris, 339 F.3d at 637 n.4 (internal quotation marks omitted) (quoting Osborn, 918 F.2d at 729 n.6).

NSA's motion to dismiss is a facial attack on jurisdiction because it is based on the complaint and undisputed facts in the record. Shingobee neither challenges any evidence submitted by NSA nor has submitted any evidence of its own. The parties disagree not about the facts but rather the legal import of those facts. See Docket. No. 12, p. 5 (identifying NSA's "citizenship" as "the core of the dispute"). Shingobee agrees that NSA "is a tribal corporation organized to conduct business on behalf of [the MHA Nation]" but disagrees that such a corporation is free from citizenship in the state in which it has its principal place of business. See Docket No. 1, p. 1 ("As such [a corporation]," NSA should be "deemed a citizen of North Dakota."); Docket No. 12, p. 4 ("[NSA] appears to rely on an argument that it is an extension of the Tribe, rather than a separate corporation, to support a conclusion that this Court does not have subject matter jurisdiction over this dispute. This is an incorrect interpretation of the law." (emphasis added)).

---

[5] When deciding a 12(b)(6) motion, a court can consider matters outside the pleadings as long as they are "necessarily embraced by the pleadings." Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999).

Because NSA's jurisdictional attack is facial, the Court views the complaint in the light most favorable to Shingobee and accepts as true the facts alleged therein. See Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994).

B.    **DIVERSITY JURISDICTION**

Under 28 U.S.C. § 1332(a)(1), "[a] federal court has original jurisdiction over a civil action if the parties are of diverse state citizenship and the courts of the state in which the federal court sits can entertain the suit." Auto-Owners, 495 F.3d at 1020 (internal quotation marks omitted) (quoting Weeks,797 F.2d at 672). For the parties to be of diverse state citizenship, there must be complete diversity between opposing parties, meaning that no defendant may be a citizen of a state of which a plaintiff also holds citizenship. Junk v. Terminix Intern. Co., 629 F.3d 439, 445 (8th Cir. 2010).

The particular question of whether a court has diversity jurisdiction over a tribal corporation[6] brings together two divergent legal standards—the standard for determining a corporation's citizenship and the standard for determining a tribe's citizenship. A corporation is "deemed to be a citizen of every State and foreign State by which it has been incorporated and of the State or foreign State where it has its principal place of business." 28 U.S.C. § 1332(c)(1).

But a tribe "is not a citizen of any state and cannot sue or be sued in federal court under diversity jurisdiction." Auto-Owners, 495 F.3d at 1020 (internal quotation marks omitted) (quoting Standing Rock Sioux Indian Tribe v. Dorgan, 505 F.2d 1135, 1140 (8th Cir. 1974)); accord

---

[6] "An Indian tribe may incorporate or charter a corporation using one of two methods: it can incorporate under section 17 of the Indian Reorganization Act, or it can become a corporation pursuant to its own tribal laws. A tribal subentity also may incorporate under state law." Am. Vantage Cos., Inc. v. Table Mountain Rancheria, 292 F.3d 1091, 1095 (9th Cir. 2002) (internal citations omitted), as amended on denial of reh'g (July 29, 2002)

6

Gaming World Int'l v. White Earth Band of Chippewa Indians, 317 F.3d 840, 847 (8th Cir. 2003) ("Diversity jurisdiction is not available here under 28 U.S.C. § 1332 because Indian tribes are neither foreign states nor citizens of any state." (internal citation omitted)).

Which of those two standards applies to NSA—the one for tribes or the one for corporations—turns on the application of one of two lines of cases. NSA argues that the Eighth Circuit Court of Appeals has conclusively treated "tribal corporations as agencies, authorities and arms of the tribes" under a line of cases interpreting *Weeks*, 797 F.2d 668 (tribal housing authority). See Docket No. 9, p. 12; Docket No. 14, p. 6. That line of cases includes *Auto-Owners*, 495 F.3d (tribal school and school board); *Hagen v. Sisseton-Wahpeton Cmty. Coll.*, 205 F.3d 1040 (8th Cir. 2000) (tribal school); *Dillon v. Yankton Sioux Tribe Hous. Auth.*, 144 F.3d 581 (8th Cir. 1998) (tribal housing authority); and *U.S. ex rel. Kishell v. Turtle Mountain Hous. Auth.*, 816 F.2d 1273 (8th Cir. 1987) (tribal housing authority). See Docket No. 9, p. 12; Docket No. 14, p. 6.

Shingobee counters that *Weeks* and its progeny are "distinguishable from the present case because they involve tribal authorities and agencies rather than separate tribal corporations" and that, instead, the Court should follow other court's interpretation of Section 1332(c) as applied to tribal corporations. See Docket No. 12, pp. 5-6. Specifically, Shingobee urges the Court to follow *Cook v. AVI Casino Enterprises, Inc.*, 548 F.3d 718, 723 (9th Cir. 2008); *Gaines v. Ski Apache*, 8 F.3d 726 (10th Cir. 1993); *Wells Fargo Bank, Nat. Ass'n v. Lake of the Torches Econ. Dev. Corp.*, 658 F.3d 684, 693 (7th Cir. 2011) (interpreting *Auto-Owners*); and *J.L. Ward Assocs., Inc. v. Great Plains Tribal Chairmen's Health Bd.*, 842 F. Supp. 2d 1163, 1181 (D.S.D. 2012). See Docket No. 12, p. 6.

It is important to note at the outset that, if NSA were a tribal housing authority or a tribal school, the cases cited by NSA would entirely resolve this case. Nonetheless, those cases reject

7

the approach to Section 1332(c) applied in *Cook* and *Gaines* and, when read together, make clear that this case falls within the purview of their combined holdings. NSA's corporate formation and purpose are analogous to those of the tribal housing authorities in *Weeks*, *U.S. ex rel Kishell*, and *Dillon*.

## 1. STATE CITIZENSHIP OF TRIBAL CORPORATIONS

Starting with the line of cases cited by Shingobee, the courts applied a textual interpretation of Section 1332(c) to hold that an entity incorporated under tribal law is subject only to state citizenship in the state in which it has its principal place of business because there is no state by which is was incorporated. See Cook, 548 F.3d at 723-24 (A tribal corporation is "only a citizen of . . . the location of its principal place of business."); Gaines, 8 F.3d at 729 (A corporation chartered under tribal law "may be considered a citizen of the state of its principal place of business for diversity jurisdiction purposes."); see also Lake of the Torches Econ. Dev. Corp., 658 F.3d at 693 (citing *Cook* and *Gaines* and "join[ing] . . . the Ninth and Tenth Circuits" to "hold that a corporation chartered under Native American tribal law should be treated as a citizen of a state pursuant to § 1332(c))."

The Eighth Circuit Court of Appeals has rejected that approach. First in *Weeks* and again in *U.S. ex rel Kishell*, the court held that a tribal corporation's citizenship cannot be established under Section 1332(c) by simply looking to a tribal corporation's principal place of business as Shingobee suggests. The court in *Weeks* reasoned:

> Because the Housing Authority, though not organized under state law, has its principal place of business in South Dakota and Weeks is a Montana corporation, a literal reading of section 1332 would appear to give the district court jurisdiction over this suit based on diversity of citizenship. However, the unique legal status of Indians and Indian tribes requires consideration of Indian sovereignty as a backdrop against which the federal jurisdictional statutes must be read. It is in light of that

8

unique status that we find that the district court correctly declined to exercise diversity jurisdiction here.

797 F.2d at 672-73 (internal citation and footnote omitted).

In *U.S. ex rel. Kishell*, the court similarly held that, even if

on the face of the complaint the statutory requirements of section 1332 had been met . . . when the parties to a case are Indians and the challenged acts occurred on a reservation, other factors must be taken into account before determining that a case may properly be heard in federal court. The federal government's longstanding policy of encouraging tribal self-government has been repeatedly recognized, reflecting the fact that Indian tribes retain attributes of sovereignty over both their members and their territory.

816 F.2d at 1276.

In place of a literal reading of Section 1332(c), the operative inquiry in the Eighth Circuit considers a tribal corporation's manner of formation and purpose. If a tribal corporation is "'established by a tribal council pursuant to its powers of self government,'" then it must be treated "as a tribal agency [with no state citizenship] rather than a separate corporate entity created by the tribe." Dillon, 144 F.3d at 583 (quoting Weeks, 797 F.2d at 670); see also Hagen, 205 F.3d at 1043 (quoting Weeks, 797 F.2d at 670 and quoting Dillon, 144 F.3d at 583); Auto-Owners, 495 F.3d at 1021 (quoting Weeks, 797 F.2d at 670 and quoting Dillon, 144 F.3d at 583). The Court now considers *Weeks*, *U.S. ex rel Kishell*, *Dillon*, and *Auto-Owners* in detail.

Of the four cases, *Weeks* is the most factually similar to this case. *Weeks* involved a contract dispute brought by a non-tribal corporation against a tribal housing authority incorporated under tribal law. 797 F.2d at 670-71 (discussing the tribal ordinance "allowing the Authority to sue and be sued in its corporate name" (emphasis added)). The court held that the housing authority was "a tribal agency" because it was "established by a tribal council pursuant to [the council's] powers of self-government." Id. at 670. That housing authority, much like NSA, "was created by Oglala Sioux tribal ordinance to develop and administer housing projects on the Pine Ridge Indian

9

Reservation in South Dakota" and contracted with a Montana corporation "to build housing units on the reservation." Id. at 670; see also id. at 673 n.5 (noting that the housing authority was "organized under tribal ordinance to conduct business on the [T]ribe's behalf.").

*U.S. ex rel. Kishell* involved a suit against "a corporation created by the Tribe to provide low-income housing on the reservation." 816 F.2d at 1274. Citing *Weeks*, the court "conclude[d] that the district court correctly refused to exercise federal jurisdiction based on diversity of citizenship" and that the housing authority was "an agency formed by the Tribe for the purpose of pursuing functions intimately related to tribal self-government."[7] Id. at 1276-77.

In *Dillon*, the court analogized to *Weeks* to find that a housing authority was also "'established by a tribal council pursuant to its powers of self government.'" 144 F.3d at 583 (quoting Weeks, 797 F.2d at 670). The tribal housing authority was chartered pursuant to a tribal resolution with a purpose, among others, to "moderniz[e] Indian housing developments on the Yankton Sioux Reservation." Id. at 582. With little further analysis, the *Dillon* court then concluded, "Therefore, we must treat the Authority as a tribal agency rather than a separate corporate entity created by the tribe." Id. at 583.

To illustrate the breadth of the *Weeks* holding, *Weeks* was cited as support for the conclusion that "there [was] no diversity jurisdiction over [a] tribally owned and operated casino." Abdo v. Fort Randall Casino, 957 F. Supp. 1111, 1112 (D.S.D. 1997) (citing Weeks, 797 F.2d at 673). Likewise, *Hagen* and *Auto-Owners* make clear that the rules established in *Weeks* and *Dillon* are not limited to tribal housing authorities.

---

[7] The conclusion that the housing authority was a tribal agency was made within the context of exhaustion of tribal remedies. Courts, however, frequently discuss what constitutes a tribal agency for purposes of one issue when deciding a distinct issue. See infra note 8.

*Hagen* involved a suit against a tribal community college that the Tribe had chartered "pursuant to its constitution . . . as a nonprofit corporation to provide post-secondary education to tribal members on the Lake Traverse Reservation." 205 F.3d at 1042. The court cited with approval the rule that "a housing authority, established by a tribal council pursuant to its powers of self-government, is a tribal agency." Id. at 1043 (internal quotation marks omitted) (quoting Dillon, 144 F.3d at 583). The court then concluded that the nonprofit tribal college was a tribal agency because it "serves as an arm of the tribe and not as a mere business." Id.[8]

Like *Hagen*, *Auto-Owners* involved a diversity suit against a tribal school. 495 F.3d at 1019. In *Auto-Owners*, an insurance company brought a federal diversity action against a tribal school and education board to determine whether their insurance policy covered the sexual assault of one student by another after a negligence suit was filed against them in tribal court. Id. The court cited the language from *Weeks*, *Dillon*, and *Hagen* to conclude that no diversity jurisdiction existed.

> In the present case, no diversity jurisdiction exists as a basis for subject matter jurisdiction because [the combined School and Education Board]—a sub-entity of the Spirit Lake Sioux Tribe—is considered a part of the Indian [T]ribe. *See, e.g., Hagen v. Sisseton–Wahpeton Cmty. Coll.,* 205 F.3d 1040, 1043 (8th Cir. 2000) ("It is [ ] undisputed that a tribe's sovereign immunity may extend to tribal agencies. . . . [H]ere the [Community] College serves as an arm of the tribe and not as a mere business and is thus entitled to tribal sovereign immunity."); *Weeks,* 797 F.2d at 670 ("It has been held that a housing authority, established by a tribal

---

[8] Even though *Hagen* was premised on federal question jurisdiction not diversity jurisdiction and was decided on sovereign immunity grounds, see 205 F.3d at 1042-43 (discussing tribal corporation's claim of immunity from employment discrimination suit), *Hagen*'s application of *Dillon* is nonetheless helpful in delineating the boundary between a tribal agency and a separate corporate entity. For example, *Auto-Owners* relied on *Hagen* to conclude that no diversity jurisdiction existed for a suit against a tribal entity. See Auto-Owners, 495 F.3d at 1021 (quoting Hagen, 205 F.3d at 1043). *Hagen* and *Auto-Owners* are not alone in their cross-application of standards for diversity jurisdiction and tribal sovereign immunity. See, e.g., Dillon, 144 F.3d at 583 (applying *Weeks* to questions of tribal sovereign immunity).

council pursuant to its powers of self-government, is a tribal agency."); *Dillon v. Yankton Sioux Tribe Hous. Auth.,* 144 F.3d 581, 583 (8th Cir. 1998) ("Therefore, we must treat the Authority as a tribal agency rather than a separate corporate entity created by the tribe.").

Id. at 1021. The *Auto-Owners* court offered little further analysis to support its conclusion.

Subsequently, *Auto-Owners* was relied on to conclude that a tribal entity "operating under [tribal] authority" was "the equivalent of direct tribal action." The Spirit Lake Sioux Tribe of Indians v. The Nat'l Collegiate Athletic Ass'n, No. 2:11-CV-95, 2012 WL 12886993, at *3 (D.N.D. May 1, 2012) (citing Auto-Owners, 495 F.3d at 1021), aff'd on other grounds sub nom. Spirit Lake Tribe of Indians ex rel. Comm. of Understanding & Respect v. Nat'l Collegiate Athletic Ass'n, 715 F.3d 1089 (8th Cir. 2013).

Because *Auto-Owners* makes no mention of the status of incorporation of either the School or the Education Board—though it seems likely the Education Board was not a corporate entity— other courts have interpreted *Auto-Owners* as applicable only to unincorporated tribal entities. For example, the Seventh Circuit, pursuant to its adoption of the literal interpretation of Section 1332, interpreted *Auto-Owners* "to apply only to unincorporated tribal agencies." Lake of the Torches Econ. Dev. Corp., 658 F.3d at 693.

At least one district court has similarly interpreted Auto-Owners. J.L. Ward, 842 F. Supp. 2d at 1181 (describing the *Auto-Owners* defendants as "an apparently unincorporated tribal education board and school"). The *J.L. Ward* court viewed a tribal entity's status of incorporation as the "critical" distinction in determining diversity jurisdiction. 842 F. Supp. 2d at 1181 (finding that a tribal corporation incorporated under state law was subject to Section 1332).

Regardless of whether the entities in *Auto-Owners* can be analogized to tribal corporations, *Weeks* establishes, and *Dillon*, *Hagen*, and *Auto-Owners* confirm, that the operative question is

12

whether NSA is a tribal agency established by the Tribe's governing body pursuant to its powers of self-government or whether it is a separate corporate entity.

## 2. STATE CITIZENSHIP OF NSA

Relying on *Dillon*, *Hagen*, and *U.S. ex rel Kishell*, NSA asserts that it "is an extension of the Tribe and cannot be a citizen of a state for diversity jurisdiction purposes" because it "was created by the Tribe and is a wholly-owned tribal corporation . . . [l]ike the non-profit corporations or housing authorities" in those cases. See Docket No. 9, p. 12. NSA has submitted multiple documents to support its position. See Docket No. 10; Docket No. 10-1 to -8.[9]

Shingobee argues that this case is "distinguishable" from *Auto-Owners*, *Dillon*, and *U.S. ex rel Kishell* and that *Hagen* "is not controlling over the present case." See Docket No. 12, pp. 5-6. Instead, Shingobee asserts that the Court should follow the Seventh Circuit's approach in *Lake of the Torches Economic Development Corp.*, 658 F.3d 684 (interpreting *Auto-Owners*); *Cook*, 548 F.3d 718 (9th Cir. 2008); *Gaines*, 8 F.3d 726 (10th Cir. 1993); and *J.L. Ward Associates*, 842 F. Supp. 2d 1163 (D.S.D. 2012). See Docket No. 12, p. 6. Shingobee has submitted no additional evidence to support its position.

The facts alleged in the complaint, taken as true, together with the undisputed facts in the record show that NSA was established by a tribal council pursuant to its powers of self-government

---

[9] Those documents include: (1) an affidavit from MHA Nation's legal counsel, (2) NSA's certificate of incorporation, (3) NSA's articles of incorporation, (4) the contract between NSA's predecessor and Shingobee, (5) the bylaws of NSA's predecessor, (6) the tribal resolution dissolving NSA's predecessor and authorizing NSA "to assume all assets and liabilities," (7) the tribal resolution enacting the Tribal Business Corporation Act, and (8) the Tribal Business Corporation Act. See Docket No. 10; Docket No. 10-1 to -8. Those documents are relevant to the Court's subject matter jurisdiction because they show the purpose for which NSA was created and NSA's scope of authority, which in turn reveals the relationship between the MHA Nation and NSA.

and that NSA functioned much like a tribal housing authority for the northern portion of the Fort Berthold Reservation.

The complaint states that (1) Shingobee "is a Minnesota corporation" and has a principal place of business in Minnesota; (2) NSA "is a tribal corporation organized to conduct business on behalf of the [MHA Nation] of the Fort Berthold Reservation of North Dakota" with a principal place of business in North Dakota; (3) NSA's predecessor originally contracted with Shingobee to construct "The Red Hawk Estates Project," a thirty-unit apartment complex, in New Town, North Dakota; (4) NSA "assumed all assets, liabilities, rights, and obligations" of its predecessor; and (5) NSA subsequently amended the contract with Shingobee to first "revise[] the scope of work" and later to add an additional thirty-six "apartment units" to the Project. See Docket No. 1, pp. 1-3.

NSA submitted an affidavit from the MHA Nation's tribal counsel stating that NSA is "a wholly owned nonprofit corporation of the [MHA] Nation." See Docket No. 10, p. 1. That affidavit states that NSA "is funded, controlled, chartered, and wholly-owned by the Tribe," was "created for the sole benefit and interest of the Tribe," and that its "functions intimately relate to the Tribe's self-government and are quasi-governmental activities." See Docket No. 10, p. 2. That affidavit further states that NSA's predecessor, from which NSA "assumed all assets, liabilities, rights and obligations," "was created by the Tribe according to tribal law to provide needed housing for the Tribe." See Docket No. 10, p. 2; Docket No. 10-6, p. 3.

On March 8, 2017, the Tribal Business Council authorized the formation of NSA as a tribal non-profit corporation "under the laws of the Tribe," and articles of incorporation were filed that same day. See Docket No. 10-1, p. 2; Docket No. 10-2, p. 2.[10]

---

[10] NSA does not appear to be the Housing Authority for the MHA Nation. See http://www.fbha.org/housing-news (recognizing the Fort Berthold Housing Authority and stating its mission to be "assist[ing] the Mandan, Hidatsa and Arikara people and their extended family to reside and/or acquire affordable homes that are safe, decent and sanitary" and "to maximize all

The articles of incorporation state that NSA's purposes are to: (1) "serve the common welfare of the North Segment of the Three Affiliated Tribes"; (2) "serve the social, economic, educational and health needs of the North Segment of the Three Affiliated Tribes"; (3) "develop and manage housing and other infrastructure to improve the lives and quality of life of the residents of the North Segment of the Three Affiliated Tribes"; (4) "enhance the North Segment's economic self-sufficiency and self-determination"; (5) "provide positive, long-term social, environmental and economic benefits to tribal members by enhancing the North Segment's business undertakings and prospects"; and (6) "carry out the purposes of the Corporation in a manner consistent with a non-profit corporation." See Docket No. 10-2, p. 2. To accomplish those purposes, NSA "shall have and may exercise all of the rights, powers, and privileges now or hereafter conferred upon corporations organized under the law of the Tribe" and "may do everything necessary, suitable or proper for the accomplishment of any of its purposes." See Docket No. 10-2, p. 2.

The articles of incorporation further specify that NSA may "exercise the following powers": (1) "take tribal appropriations and carry out the stated purposes of the funding"; (2) "enter business associations[] and other business arrangements"; (3) "purchase, sell and manage residential and commercial real property within and under the control of the North Segment"; (4) "manage the Northern Lights Community Building and all other community facilities"; (5) "conduct and carry out business either within or outside of the exterior boundaries of the Fort Berthold Reservation"; and (6) "exercise such powers as are incidental to the Corporation's powers and as may be at any time permitted under the laws of the Tribe and deemed desirable to give effect to the Corporation's purpose." See Docket No. 10-2, p. 3.

---

resources, human and natural, in an efficient, reasonable and timely manner, within our ancestral lands").

NSA's bylaws corroborate the purposes for which NSA was formed. Its bylaws state that NSA "is organized exclusively for the purposes of developing housing and other infrastructure to improve the lives and quality of life of the residents of the North Segment of . . . Fort Berthold Reservation" and that its "specific purposes . . . are to provide and manage resources for programs, services and other projects that will promote greater opportunities for business, housing and education for residents of North Segment." See Docket 10-4, p. 2.

NSA's formation and purpose are analogous to those of the tribal housing authorities at issue in Weeks and its progeny. Weeks is the most compelling. See Hagen, 205 F.3d at 1044 (Even in the face of conflicting precedent, it is "compelling" to apply the case whose parties and causes of action are "squarely on point" with those of the case at bar.). Here, almost identically to Weeks, a non-tribal construction company incorporated under state law brings breach-of-contract actions against a tribal non-profit corporation created by the MHA Nation pursuant to tribal law for the "exclusive[]" purpose of "developing housing and other infrastructure to improve the lives and quality of life of the residents of the North Segment of . . . Fort Berthold Reservation." See Docket 10-4, p. 2. It was presumably in furtherance of that purpose that NSA contracted with Shingobee to construct an apartment complex in New Town.

NSA may not be a tribal housing authority in name, but there is no discernible difference between its formation and purpose and those of the housing authorities held to be tribal agencies by the Eighth Circuit. NSA was created by the MHA Nation to provide housing on the Reservation. If a tribally owned and operated casino is a tribal agency and not a separate corporate entity subject to diversity jurisdiction, see Abdo, 957 F. Supp. at 1112, then NSA must also be a tribal agency not subject to diversity jurisdiction.

In sum, NSA functions as a tribal agency and is not subject to diversity jurisdiction under Section 1332(c). Because Shingobee does not assert federal question jurisdiction, it is not necessary to decide whether tribal sovereignty extends to NSA or whether that sovereignty has been waived. Consent to be sued cannot alone confer jurisdiction. See Auto-Owners, 495 F.3d at 1020; Weeks, 797 F.2d at 671.

## III.   CONCLUSION

The Court has carefully considered the pleadings, the parties' briefs, the undisputed evidence of record, and the relevant case law. For the reasons sets forth above, the Court concludes that NSA is not a citizen of a state subject to federal diversity jurisdiction under 28 U.S.C. § 1332. The Defendant's motion to dismiss, see Docket No. 8, is **GRANTED**. The Defendant's motion for oral argument regarding its motion to dismiss, see Docket No. 15, is **DENIED**.

**IT IS SO ORDERED**.

Dated this 1st day of October, 2018.

*/s/ Daniel L. Hovland*
Daniel L. Hovland, Chief Judge
United States District Court